London, though it should seem nearly twenty miles below the usual places of unloading, constituted an importation. Leaper v. Smith, Bunb. 79. Upon a careful examination of the case of U. S. v. Vowel, 5 Cranch [9 U. S.] 368, the court evidently consider, that an importation into the United States did not mean an arrival within the limits of the United States, or even of a collection district, but within some port, harbor, &c. with an intention there to unload the goods. The case there was, that a cargo of salt had arrived within the collection district, but not within the port of Alexandria until after the repeal of the act, levying a duty on salt. The words of the first act were, that a duty should be levied upon all salt, &c. "brought into the United States," from any foreign port or place, &c. (Act Aug. 10, 1799, c. 39, § 1), and of the supplementary act, upon all salt "imported into the United States" (Act July 8, 1797, c. 15, § 1). The court held that the duty was not payable, because it did not accrue until the vessel arrived at the port of Alexandria. They consequently held, that until such arrival the importation was not completed.

The statutes of the United States on the subject of the revenue, evidently adopt the same construction. The 32d sect. of the collection act of 2 March, 1799, c. 128 [1 Story's Laws, 601 (1 Stat. 651, c. 22)], contemplates the case of a vessel arriving at a port of the United States, with a destination of her cargo to a foreign port, and provides that, in such case, the cargo shall not be liable to the payment of duties. The 2d section of the act, 22d Feb. 1805, c. 78 [2 Story's Laws, 962 (2 Stat. 316, c. 18)], has a similar provision. I consider, therefore, the mere arrival within the jurisdictional limits of the United States, even supposing that they extend beyond a marine league, and to the four miles stated in the evidence, as not constituting an importation within the purview of the law. If this be true, there can be no doubt that the subsequent arrival within the port of Boston, in consequence of stress of weather, cannot be considered as an importation. The cases of distress and wreck are exempted from the operation of these, and I believe most other revenue laws. See Sheppard v. Gosnold, Vaughan, 159, 166; Courtney v. Bower, 1 Ld. Raym. 501; Hale, "Customs;" Harg. Law Tracts, 123; Peisch v. Ware, 4 Cranch [8 U. S.] 347, 355, note; Reeves, Shipp. (2d Ed.) 196, etc.; Reniger v. Fogossa, 1 Plowd. 1; Hardr. 358, 361; 2 Ruth. Inst. 353.

On the whole, I am satisfied that neither vessel nor cargo is forfeited. There was no loading with an illegal intent to import into the United States, which would affect the former with forfeiture, and no voluntary illegal importation, which would contaminate the latter.

I affirm the decree of the district court as to vessel and cargo, but I shall certify reasonable cause of seizure. Restored.

# Case No. 9,184.

## The MARY.

[1 Gall. 620.] [1]

Circuit Court, D. Rhode Island. Nov. Term, 1813. [2]

PRIZE—ENEMY PROPERTY—KNOWLEDGE OF WAR.

A shipment made from the enemy's country after a knowledge of the war, by an American citizen, subjects the property to confiscation as prize of war.

Appeal from the district court of the United States for the district of Rhode Island.

In admiralty.

Boss & Woodward, for captors.
Searle & Crapo, for claimant.

STORY, Circuit Justice. The brig Mary and cargo were captured on the 22d of April, 1813, by the privateer Paul Jones, Captain Taylor, being then on a voyage from Waterford, in Ireland, to Newport, with a cargo of British merchandize on board. It appears in evidence and is admitted, that the brig, with her cargo on board, sailed from Bristol on the 16th of August, 1812, and having received damage at sea, put back into Waterford about five days afterwards, and remained there until the 7th of April, 1813, when she sailed, by permission of the British government, for the United States. The declaration of war was published in the London Gazette on the 26th of July, 1812, and was well known at Bristol within one or two days after. The invoices of the cargo are dated the 13th of August, 1812, and it seems the whole is insured in England; but the exact day, when the shipment was actually made, does not precisely appear. No claim is interposed for the brig; but the cargo is claimed by a Mr. Nanning I. Vischer, as administrator of a General Fisher, an English gentleman, who is said to have died in England, and whose heirs are said to reside in this country. The cargo is alleged to have been shipped, as an investment of part of the proceeds of General Fisher's estate, for the benefit of his heirs. Who these heirs are, and how they claim, is not stated.

From the evidence in the cause, which I forbear to detail, I am by no means satisfied of the verity of the facts alleged in the claim; and I think it would be very difficult to establish the title to be bonâ fide American. There are instructions in the letters found on board, which carry a pretty strong odor of concealed British interests, although written after knowledge of the war. At all events here is a clear trading with the public enemy after knowledge of the war; and I cannot open the case to show, that the goods were purchased and shipped before that time.

I condemn the brig and cargo, as enemies'

---

[1] [Reported by John Gallison, Esq.]
[2] [Affirmed in part and reversed in part in 8 Cranch (12 U. S.) 388.]

property, and reverse the decree of the district court.

Affirmed as to the ship; and reversed as to the cargo, upon another point appearing upon further proof ordered. 8 Cranch [12 U. S.] 388. See The St. Lawrence [Case No. 12,232].

## Case No. 9,185.

### The MARY.

### [1 Mason, 365.] ¹

Circuit Court, D. Massachusetts. May Term, 1818.

#### SHIPPING—PRIVATEER—DAMAGES—OWNER—ESTOPPEL.

If a person has in the acts of court asserted himself as part owner of a privateer, he will be responsible as such owner for damages assessed against such privateer, although his name be not in the ship's papers.

This cause having been decided in favor of the privateer Cadet against the claim of the privateer Paul Jones the damages were assessed against the owners of the latter, under the decree of the supreme court, which is reported at large in 2 Wheat. [15 U. S.] 123. At May term, 1817, of the circuit court, process issued against the owners, who were named in the commission and ship's papers, for the damages so assessed; but the process was returned unsatisfied. And at October term, 1817, the plaintiffs filed a petition praying for a monition against Messrs. Bryant and Sturgis as joint owners, to compel them to pay the damages. It appeared of record in the proceedings, that at May term, 1816, Messrs. Bryant and Sturgis filed a petition in the circuit court, alleging that the Mary [Thomas, master] had been condemned in the district court, of Maine, "to them the petitioners and others, owners of the private armed vessel Paul Jones as captors;" that the same decree had been affirmed in the circuit court "adjudging the said vessel and cargo to the petitioners and others, said owners, as captors;" and praying a delivery of the proceeds to them, on bail pending the appeal to the supreme court. This petition was resisted on the part of the owners and officers of the private armed vessel Cadet, and finally an agreement was entered into by the parties, at the same term, as follows: "In the case of the application of Messrs. Bryant and Sturgis, in behalf of themselves and others, owners of the private armed vessel Paul Jones, &c. praying that the proceeds of the prize vessel might be paid out to them, on giving bonds, &c. It is agreed by the parties in interest, that one half of the said proceeds be paid out as prayed for and one half thereof be in like manner paid out to the adverse claimants, (the owners of the Cadet,) each giving therefor such security as the other shall approve, to be approved by the judges at chambers, or in court." The proceeds were paid

out accordingly, and the proper approved security given, and Messrs. Bryant and Sturgis received one moiety thereof.

A monition was granted by the court against Messrs. Bryant and Sturgis, to appear and show cause, why the damages should not be paid by them. At the return of the monition they accordingly appeared, and filed a special answer, and defensive allegation on oath. It stated that at the time of the equipment and commissioning of the Paul Jones, she was armed by one Samuel Hubbard, who gave bonds at the custom house on the outfit for the cruise; that after the equipment of the Paul Jones, one Joshua Hilton representing himself a part owner, and being indebted to the respondents, proposed to give them one sixteenth part of the Paul Jones for five hundred dollars, in satisfaction of their demand, to which the respondents assented; that no written conveyance has been since made, and no money or settlement with Hilton upon that contract, although it was, and is, the expectation of the respondents to allow the said sum in account with Hilton on settlement; that the said Hubbard was constituted agent for the privateer, and that the proceeds have been paid into his hands, and are received by him for payment of the sums due in this case; and they, therefore, prayed that a monition might issue to the said Hubbard, and his sureties, on the custom-house bond, and to the other owners, to pay the amount before the respondents should be made liable; and they submitted to the court the question of their liability.

The court directed a monition against the sureties in the said bond. And the question as to the liability of Bryant and Sturgis as owners, was several times spoken to by Mr. Sprague, for owners of the Cadet, and by L. Shaw, for respondents.

STORY, Circuit Justice. Whatever might have been my opinion upon the special facts stated in the answer, as to which I affirm and deny nothing, I am very clear, that the proceedings of Messrs. Bryant and Sturgis, in the acts of court, in which they assert themselves to be owners, and claim a delivery of the prize proceeds on bail in that character, are conclusive upon them, and they cannot now be permitted to deny, that they are owners at least to the extent of being responsible for the damages in this case. This case is much stronger than that of The Nostra Signora de los Dolores, 1 Dod. 290, where Sir William Scott held a person liable, as owner, for damages, although his name was not in the ship's papers. There the party had only asserted himself owner by acts in pais; here the respondents assert it by acts of record, and must be estopped by such acts. The prize proceeds were delivered to them on bail, in virtue of their character as owners. How can the court now consistently permit them to shake off the

¹ [Reported by William P. Mason, Esq.]